IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PETER S. WILLMOTT, | ) | |
| | ) | |
| Plaintiff , | ) | Case No. 05 C 1124 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| FEDERAL STREET ADVISORS, INC., | ) | |
| a Massachusetts corporation, and | ) | |
| BANK OF AMERICA, N.A., | ) | |
| a Federally Chartered National Bank | ) | |
| | ) | |
| Defendant . | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Peter S. Willmott ("Willmott") filed suit against Federal Street Advisors, Inc. ("Federal Street") and Bank of America, N.A. ("BOA") alleging various state law violations in contract and tort. The Complaint against Federal Street and BOA arose as a result of embezzlement from Willmott's accounts by Rose Erwin ("Erwin"), Willmott's personal secretary, that resulted in Erwin's criminal conviction. Willmott now seeks to recover against Federal Street and BOA for violations of their agreements with Willmott that he alleges facilitated Erwin's criminal conduct.

BOA filed two motions pursuant to Federal Rule of Civil Procedure 16(c) to address specific legal issues that BOA alleged barred Willmott's claims and The Court treated those as motions for partial summary judgment. First, BOA moved for a determination that any damages Willmott sought in Count VI of Plaintiff's Amended Complaint were properly characterized as consequential damages and therefore not recoverable. This Court held that some of the damages were direct and

some of the damages were consequential. Because consequential damages were barred by the terms of the contract, the motion was granted in part and denied in part. Second, BOA moved to eliminate all the claims against it arguing that they were barred by the Illinois Fiduciary Obligations Act. Because the Court found that a genuine material fact existed as to whether Erwin was acting as Willmott's authorized fiduciary, that motion was denied.

BOA now brings a Motion for Summary Judgment,[1] arguing that it is not responsible for Willmott's losses because it fullfilled its duties under the contracts and owed Willmott no extracontractual duties and regardless, all Willmott's claims were barred by its affirmative defenses, namely apparent authority, estoppel, and ratification. Because this Court finds that Erwin had apparent authority to draw from Willmott's lines of credit and Willmott ratified her actions, BOA's Motion for Summary Judgment is granted.

---

[1]At this time, Federal Street has not filed dispositive motions regarding any of Willmott's claims. Therefore, this Memorandum Opinion and Order addresses only Willmott's claims against BOA.

<u>**STATEMENT OF FACTS**</u>[2]

Willmott is a successful businessman who has been a director of various large companies since the 1970's. BOA 56.1 at 1, 5.[3] Willmott used BOA's "Private Bank" services and maintained checking and deposit accounts, lines of credit, and custodial accounts with collateral for the lines of credit. *Id.* at ¶ 6. Several employees at BOA worked in the Private Bank division and

---

[2] Local Rule 56.1 allows an opposing party to file a "concise response" to the opposing party's statement of undisputed material facts. BOA's Response to Willmott's Local Rule 56.1(b)(3)(C) Statement of Additional Facts in many instances failed to comply with L.R. 56.1. Instead of simply asserting a concise response, BOA often included extra, sometimes relatively lengthy, arguments in its responses. To this end, Willmott moved to strike several of BOA's responses.

The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Serv., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting cases)). "A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005) (citing *Midwest Imports Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) for the proposition that "[a] local rule of a federal district court is written by and for district judges to deal with the special problems of their court, and we are disposed therefore to give a district judge's interpretation of his court's local rules . . . considerable weight."). Accordingly, this Court would have been justified in disregarding several of BOA's responses to Willmott's statements of fact. Nevertheless, in the interest of resolving the parties' dispute as efficiently as possible, the Court has not considered the portions of BOA's responses that it labels additional argument, rather than concise responses. Willmott's Motion to Strike BOA's Responses in thus granted in part and denied in part.

[3] Throughout this Memorandum Opinion and Order, The Court refers to BOA's First Statement of Undisputed Facts, Second Statement of Undisputed Facts, and Third Statement of Undisputed Facts as BOA 56.1, BOA 2nd 56.1, and BOA 3rd 56.1, respectively. The Court refers to Willmott's First Statement of Additional Undisputed Facts, Second Statement of Additional Undisputed Facts, and Third Statement of Additional Undisputed Facts as Willmott 56.1, Willmott 2nd 56.1, and Willmott 3rd 56.1, respectively.

worked with Willmott's various accounts. Willmott 56.1 at 1-6.[4] Federal Street provided cash management advice to Willmott. BOA 2nd 56.1 at 19.

In December 1998, Willmott hired Erwin as his executive assistant. Am. Cmplt. at 10. Willmott hired Erwin to replace Joan Noble ("Noble"), his prior executive assistant, to whom he had given substantial authority over his financial affairs. BOA 56.1 Facts at 9. Willmott expected Erwin to provide the same services as Noble. *Id.* While Noble was Willmott's executive assistant, she drew on his lines of credit. BOA 2nd 56.1 at 10.

The Private Bank at BOA employed a team approach which generally involved a relationship manager and an executive assistant as the points of contact for Willmott's banking relationship. BOA Second 56.1 at 7. The team was to provide personalized and attentive service to clients. Willmott 56.1 at 2. The administrative assistants at the bank handled the day-to-day business relating to Wilmott's accounts such as assisting in wire transfers or processing requests for advances under the lines of credit. BOA 2nd 56.1 at 9. Wilmott's executive assistants, first Noble and then Erwin, submitted requests for draws on Wilmott's lines of credit to the administrative assistant assigned to the Willmott relationship. BOA 2nd 56.1 at 10.

According to Willmott, from February 1999 through May 2004, Erwin abused her authority by writing $11 million in checks drawn on the Checking Account for the benefit of herself and her family. BOA 56.1 at ¶ 11. Erwin wrote most of the checks to her husband, Vernon Erwin; but also wrote checks to credit card companies, AT&T Wireless, Nordstrom's and United Airlines. *Id.*; BOA 2nd 56.1 at 5; Erwin Plea Agreement at 5. In addition, Erwin wired money to Las Vegas casinos and

---

[4]Although a bank official testified that BOA monitored Willmott's credit facilities to ensure compliance with the terms of the loan agreements, Willmott 3rd 56.1 at 76, he also affirmed that the bank in fact did not monitor what Willmott was spending his money on. BOA 2nd 56.1 at 14.

car dealerships. Erwin Plea Agreement at 5-6. Erwin drew on Willmott's lines of credit to put funds in his checking account and then wrote checks for her own benefit on the checking account. BOA 56.1 at 11, 21-22. Willmott did not discover the theft until May 2004, in spite of recurring monthly checking account statements and quarterly loan statements. *Id*. at 12, 26. He fired Erwin immediately when he discovered the theft. *Id.* at 12. Erwin pled guilty to charges of embezzlement and is currently serving a prison term. *Id.* In her plea agreement, she admitted to stealing between 7 and 20 million dollars from Willmott's accounts. Willmott 56.1 at 20. None of the BOA employees deposed by Willmott were suspicious of Erwin prior to May of 2004. BOA 2nd 56.1 at 11.

During the period between February 1999 and May 2004, BOA disbursed advances on Willmott's lines of credit of approximately $18 million by means of 120 separate draws. BOA 56.1 at 16. Willmott claims that BOA breached the Loan Agreements by honoring Erwin's draw requests because the Loan Agreements prohibited BOA from permitting advances on the lines of credit without a written authorization on file and Erwin did not have Willmott's written authorization. *Id.* at 18. All of the advances on the lines of credit (other than rollovers from previous loans) were deposited into the checking account. BOA 56.1 at 21. Erwin embezzled the funds by writing checks from that checking account, for which she had Durable Power of Attorney. *Id.* at 11.

Willmott had two separate lines of credit at the Bank, one established on August 18, 1997 and one established on August 30, 1999, each pursuant to written loan agreements (the "loan agreements"). *Id.* at 15; Willmott 56.1 at 11. Willmott was the only signatory as borrower on those agreements. Willmott 56.1 at 12. Both of the loan agreements contained provisions waiving the

borrower's right to recover consequential damages on account of a breach.  BOA 56.1 at 25.  In addition, both agreements noted that "the bank may honor . . . instructions . . . given by . . . persons authorized in writing by any one of the signer(s) of this agreement."  Willmott 56.1 at 13.  Both the 1997 and 1999 Loan Agreements stated that "the Borrow indemnifies and excuses the bank . . . from all liability, loss, and costs in connection with any act resulting from telephone or facsimile instructions it reasonably believes are made by an individual authorized by the Borrower to give such instructions."  BOA 3rd 56.1 at 175.

### *Erwin's Written Authorizations*

Two months after Erwin was hired, Willmott executed and delivered an unconditional power of attorney that empowered Erwin to write checks on the checking account.  BOA 56.1 at 10.  The signed power of attorney form stated,

> By signing below, you appoint Rose Marie Erwin . . . your lawful attorney and you empower her to do the following for you and in your name (in any way you could act in person):
>
> (I) With respect to the Account to which this Power applies, to endorse checks, certificates of deposit or other instruments owned or held by you for deposit in any Account and to withdraw from and write checks or other orders for payment on any Account; to open new accounts and to close, continue, or control all Accounts; and in general, to exercise all powers with respect to any Accounts which you could if present and under no disability. . . .
>
> You authorize BofA to rely on this Power.  BofA shall honor, receive, or pay all instruments signed in accordance with this Power even though drawn or endorsed to the order of said attorney or tendered by him for cashing or delivered or used in payment of the individual obligation of such attorney, or for deposit to his personal account.  BofA shall not be required to see to the application of any property delivered to or controlled by your attorney or to question the authority of your attorney.

BOA 56.1 at 10; Durable Power of Attorney Forms.

In addition, around February 24, 1999, Willmott executed and delivered to BOA a wire transfer authorization form relating to checking account no. 5423309 authorizing BOA to process requests received from Erwin and to assume that she was acting on his authority in making such requests. BOA 2nd 56.1 at 21. The form authorized Erwin to initiate "any type of transfer" and Wilmott did not check a box requiring BOA to confirm transfer requests initiated by Erwin. *Id*.

Willmott executed two letters to BOA addressing Erwin's power of attorney over his accounts around the same time as he granted full authorization to Erwin to draw on the checking account. BOA 56.1 at ¶ 19. Specifically, on February 25, 1999, Wilmott signed a letter to Janice Gallagher of BOA stating that "Per your instructions, this letter along with the attached forms, give Bank of America Illinois my authorization to give Rose Marie Erwin Power of Attorney over my accounts to sign checks, do wire transfers, and transfer funds." Willmott 2nd 56.1 at 5. A list of ten checking account numbers followed that paragraph, including numbers related to an investment account, accounts assigned to minors, a home account, a money market account, an account related to the Willmott Foundation, and accounts related to Willmott Stables. *Id*. at 6. Willmott left blank and crossed out lines to list "other accounts and boxes at BofA to which this Power applies." *Id*. at 7. A bank official verified Willmott's signature on the letter. *Id*. at 9. Gallagher testified that she thought the letter allowed her to take direction from Erwin on all of Willmott's accounts. Willmott 3rd 56.1 at 92. However, Heidi Westland ("Westland"), one of Willmott's relationship managers characterized the letter as merely a cover letter sent in conjunction with the attached legal forms. *Id*. at 96.

In addition, Willmott attached seven signed Durable Power of Attorney bank forms for seven checking accounts and Willmott signed signature cards for three checking accounts. Willmott 2nd

56.1 at 7. The Durable Power of Attorney forms noted specifically the account to which each form applied and Willmott crossed out blanks to fill in "other Accounts and Boxes to which this Power applies." *Id*. at 7-8. Pursuant to all these forms, Erwin had authority to write checks and affect wire transfers. *Id*. at 12.

Willmott sent a second letter dated February 25, 1999 to Ellison of BOA's Custody Department. *Id*. at 13. It stated, "Per our conversation with Janice Gallagher, I wish to have this letter authorize Bank of America Illinois to give Rose Marie Erwin Power of Attorney over my accounts to sign checks, do wire transfers and transfer funds." *Id*. at 13. The letter then listed a series of account numbers, including a collateral account, investment advisory accounts, and four "private bank term loan[s]." *Id*. at 14. BOA alleges that this letter gave Erwin express and written authority to transfer funds from the 1997 and 1999 Loan Agreements and Willmott denies this. Willmott puts forth no argument as to what other loans the letter could refer to. No attachments accompanied this letter. *Id*. at 18.

Westland testified that there was a bank form that could be used when an individual wished to delegate authority on his or her account. Willmott 56.1 at 17. However, Lauerman, also one of Willmott's previous relationship managers, testified that he was unaware of any specific BOA policies and procedures regarding the proper forms for assigning powers of attorney. Willmott 3rd 56.1 at 94. Regardless, none of the bank officers involved with Willmott's lines of credit recalled seeing any written authorization from Willmott specifically related to the 1997 and 1999 loans prior to May 2004. Willmott 2nd 56.1 at 25; Willmott 3rd 56.1 at 84. Also, BOA's Private Bank

Administrative Operating Guide does not make any express reference to policies and procedures relating to powers of attorney for lines of credit. Willmott 56.1 at 28.[5]

Regardless of the lack of specific forms, Willmott admitted that he authorized Erwin to relay his requests for advances on his lines of credit to the bank under the 1997 and 1999 loan agreements. BOA 2nd 56.1 at 20. Specifically, he testified that he orally authorized her to call the bank and request loan advances. BOA 3rd 56.1 at 174. To this end, Willmott admits that he authorized *some* but not all of the advances made by Erwin. BOA 56.1 at 20, BOA 2nd 56.1 at 16. Willmott has partially identified the authorized draws but is unable to identify all of them or state with specificity which draws were decidedly improper.[6] BOA 56.1 at 20.

_____

[5]Willmott asserts that BOA's Platform Assistance Manuals ("PAMS") state specific requirements for power of attorney forms other than those supplied by the bank. Willmott 2nd 56.1 at 26-27. BOA disputed that the PAMS applied to Willmott's lines of credit, and in support of this argument, filed the Declaration of John Brennan, stating the same. Willmott seeks to strike Brennan's Declaration under F.R.C.P. 26(e)(2) and F.R.C.P. 26(a)(1).

The Court finds it unnecessary in its discretion to strike Brennan's Declaration because Willmott was not taken by surprise by BOA's position that the PAMS did not apply. *See*, *Blum v. Lawent*, No. 02 C 5596, 2003 WL 22078306, at fn 1 (N.D.Ill. September 8, 2003) (request to strike denied when there was no plausible claim of surprise). First, BOA filed a similar declaration, that of Elizabeth M. Schachner in its briefing for its original Motion for Summary Judgment on October 10, 2006. Despite this notice of BOA's position far over a year ago, Willmott apparently did not investigate the matter. Indeed, BOA represented to the Court at that same hearing that BOA and Willmott were in fact working toward stipulating to the fact that the PAMS did not apply to Willmott's lines of credit, and that BOA was surprised when Willmott returned to the position that the PAMS were relevant. *Id*. at 22:6-25. In addition, during the hearing on this Motion to Strike, BOA specifically stated that "if [Willmott] wants to take Mr. Brennan's deposition, he should be allowed to." October 10, 2007 Transcript, 23:24-24:1. Willmott declined. Willmott's Motion to Strike is therefore denied.

[6]BOA moved pursuant to Federal Rule of Civil Procedure 59(e) for this Court to reconsider its ruling on BOA's motion to bar Willmott from denying that he authorized more than 36 draws on his lines of credit. The motion is denied.

A Rule 59(e) motion to reconsider functions to present newly discovered evidence, correct manifest errors of law or fact, or identify for the court an intervening change in the law. *Cosgrove v. Bartolotta*, 150 F.3d 729, 732 (7th Cir. 1998). Here, BOA asserts that the Court's ruling is

*Evidence of Erwin's Authority*

The two employees who were responsible for the banking relationship when Willmott hired Erwin testified that based upon their interactions with Willmott and Erwin and all of the circumstances of the banking relationship they believed Erwin was authorized to make requests for draws from the lines of credit. According to the BOA employees, Erwin was clearly the contact person for Willmott's accounts. BOA 2nd 56.1 Facts at 12-13. Based upon all of their dealings on the Willmott accounts, the BOA employees did not believe that any accounts were excluded from Erwin's authority. Erwin called BOA regularly and spoke to an administrative assistant to request a draw on the lines of credit. Willmott 56.1 at 14. Indeed, one assistant assigned to Willmott's accounts never spoke to Willmott and another "rarely" spoke to him. BOA 2nd 56.1 at 10. Aside from Erwin's actions, the employees also relied on Willmott's actions in reaching this belief;

---

manifestly erroneous. A manifest error is a "'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Sedrak v. Callahan*, 987 F.Supp. 1063, 1069 (N.D. Ill. 1997), (*quoting In Re August, 1993 Regular Grand Jury,* 854 F.Supp. 1403, 1407 (S.D. Ind. 1994)). Therefore, a motion to reconsider is applicable when "the Court has patently misunderstood a party or has made a decision outside the adversarial issues presented to the Court by the parties or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1191, 1195 (N.D. Ill. 2001). A motion to reconsider does not serve to revisit arguments that have been previously rejected. *Caisse Nationale de Credit v. CBI Industries*, 90 F.3d 1264, 1270 (7th Cir. 1996). A motion to reconsider may not be used as a means to introduce theories could have been advanced earlier. *Entertainment, Inc. V. City of Northlake*, 2004 WL 1243972 *1.

In its Motion to Reconsider, BOA, for the most part, rehashes the arguments it made in its original motion and makes arguments it could have made in that motion. The only possible suggestion of a manifest error of law is BOA's argument that the Court mistakenly interpreted its motion to bar as entirely based on Federal Rule of Civil Procedure 37(d)(2), when it was primarily based on Federal Rule of Civil Procedure 16. However, BOA does not explain its reasoning as to how Rule 16 applies to its argument, and indeed, it is unclear how Rule 16, which governs pretrial conferences, applies. "Unsupported and undeveloped arguments are considered waived" and therefore BOA's arguments pursuant to Rule 16 were waived in the motion to bar and do not apply to the motion to reconsider. *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005). BOA's Motion to Reconsider is denied.

specifically Willmott told BOA that Erwin was "his person" and that the bank was to act on her authority. BOA 2nd 56.1 at 13. In addition, Gallagher, an administrative assistant, testified that if someone else called to transfer funds, Gallagher would call Erwin to get verbal approval for the transfer. Willmott 3rd 56.1 at 89. All of the BOA employees who dealt with Erwin testified that prior to May 2004 they never had any suspicions about her. BOA 2nd 56.1 at 11.

BOA sent both monthly checking account statements and quarterly loan statements to Wilmott. BOA 56.1 at 26. The statements set forth Willmott's outstanding credit balances as well as any advances made under his lines of credit. *Id*. at 26. In addition, Federal Street prepared and sent Willmott quarterly reports that reflected the outstanding balances on his lines of credit. *Id*. Beginning around December of 2001, Federal Street also sent Willmott weekly credit reports which set forth the outstanding balances on his lines of credit. *Id*.

The terms of the checking account agreement with BOA required Willmott to review his monthly statements and report any unauthorized transactions to BOA. *Id*. at ¶ 13. Wilmott admitted that he did not review his checking account statements as a regular practice. *Id*. He stopped looking at his cancelled checks after the first five years he had the BOA account. Erwin balanced his checking accounts. BOA 3rd 56.1 at 170. In her plea agreement Erwin admitted that she destroyed the bank statements and cancelled checks but did not state when she did so. Willmott 56.1 at 19.

Regardless, Willmott admitted in his deposition that he had knowledge of several of the draws on his lines of credit soon after they took place. BOA 3rd 56.1 at 149-54; 156-57; 159-62; 167. Notably, Willmott also identified his signature on two letters giving him notice of draws on his credit. *Id*. at 150, 167.

Willmott's 1997 Loan Agreement was amended on March 10, 1999, March 10, 2000, and April 8, 2002, each time to increase his borrowing limit. BOA 2nd 56.1 at 22. Willmott's 1999 Loan Agreement was similarly amended on March 10, 2000 and April 8, 2002. *Id.* These increases seemingly occurred as a result of cash flow problems. Willmott 2nd 56.1 at 36; Willmott 3rd 56.1 at 79. Also, in October 2001, following the events of September 11th and consequent downturn in the stock market, Willmott's loans fell out of margin, and he was given notice of his need to pledge additional collateral to support the outstanding principle; which he did. BOA 3rd 56.1 at 171. From time to time the loan agreements came due and were "rolled over." *Id.* at 176. Willmott admits that he was aware of these rollovers. *Id.*

### Evidence of Notice of Wrongdoing

On June 12, 2001, following a temporary increase in Willmott's borrowing limit, Federal Street sent Willmott a letter advising him that $172,175 needed to be repaid and recommending that the payment be applied to note no. 398. BOA 2nd 56.1 at 17. On that same day, BOA sent an email to Federal Street asking whether there had been a decision as to which note Willmott would repay, noting that the bank wanted "to get the $4.2MM facility reduced back to $3.2MM within the next week." *Id.* at 18. Greer, an administrative assistant who was copied on the email, replied wondering whether "everyone is communicating with each other" because Erwin had just drawn $200,000 on that line of credit that morning. *Id.* Federal Street apologized for the confusion and assured BOA that they instructed Erwin to repay the $200,000 immediately, explaining that "Rose did not realize that there was cash available to pay Pete's expenditures." *Id.* Erwin repaid the $200,000 the next day. *Id.* Acknowledging that he was informed of the BOA demand to repay the note, Willmott asserts that this event instead should have raised some concerns for BOA. Willmott 56.1 at 30.

BOA called Federal Street to confirm draws on Willmott's lines of credit on at least two occasions. On September 3, 2003 Erwin requested a credit draw of $400,000, and BOA contacted Federal Street to confirm the draw. Willmott 2nd 56.1 at 34. Similarly, on April 1, 2004, BOA called Federal Street regarding a $20,000 withdrawal from the Foundation account to pay accounting fees. *Id*. at 35.

Although Lauerman wondered why Willmott was going through so much money, at one point requiring him to contact Dickerson, who was previously assigned to Willmott's accounts, to express concerns regarding cash flow, it is unclear that these concerns were ever communicated to Willmott. Willmott 56.1 at 29; Willmott 3rd 56.1 at 79.

## **STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of*

*Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

### Fiduciary Duty

A bank generally owes no fiduciary duty to its depositors and their relationship consists of merely an arms-length transaction.[7] *Miller v. Am. Nat'l Bank & Trust Co. of Chicago*, 4 F.3d 518, 520 (7th Cir. 1993); *Thompson v. Capital One Bank*, 375 F.Supp.2d 681, 683 (N.D.Ill. 2005). Similarly, a creditor owes no fiduciary duty to a debtor. *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992); *ARH Dist., Inc. V. ITT Commercial Fin. Corp.*, No. 87 C 511, 1987

---

[7]Willmott moves to strike the Affidavit of James F. Dickerson. In said affidavit, Dickerson asserts that his deposition testimony was misrecorded. Specifically, in the deposition transcript, in response to the question "Did you have an understanding that the bank had a duty to be guarding Mr. Willmott against theft or embezzlement by his employees?" Dickerson answers "I would have to characterize that as the responsibility of the bank." Dickerson Tr. pg. 58: 14-18. Dickerson asserts in his affidavit that his statement should have read: "I would not characterize that as a responsibility of the bank." Dickerson Affidavit at ¶ 3. Willmott moved to strike this affidavit, arguing that under F.R.C.P. 30(e), Dickerson was required to make any changes to his testimony within 30 days of being notified that the transcript was available. BOA acknowledged at a hearing on the matter that this Court should assume that Dickerson said what was originally recorded for purposes of this Motion for Summary Judgment. Regardless, under Illinois law, the existence of a duty is a question of law to be decided by the court. *See*, *e.g.*, *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 232 (Ill. 2007). As such, the affidavit is stricken as irrelevant.

WL 17834, *3 (N.D.Ill. September 28, 1987) ("the relationship between a lender and a borrower under a contract is not a fiduciary relationship in which the lender owes a duty of care").[8]

## BOA's Affirmative Defenses

BOA asserts that it is not liable for Willmott's losses regardless of whether it violated its agreements with Willmott because Willmott cloaked Erwin with apparent authority to transfer money from his 1997 and 1999 loans and then ratified her actions in transferring money from the loans and is thus estopped from denying her authority.

### Apparent Authority

An agent's authority may be actual or apparent. *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004). Under Illinois law, a principal is bound "not only by the authority that he actually gives another, but also by the authority he appears to give." *Id*. at 673 (*citing Gilbert v. Sycamore Mun. Hosp.*, 622 N.E.2d 788, 795 (Ill. 1993)). As such, apparent authority arises where the "principal creates, through words or conduct, the reasonable impression that the putative agent has been granted authority to perform certain acts." *State Sec. Ins. Co. v. Burgos*, 583 N.E.2d 547, 551 (Ill. 1991) (*citing Lynch v. Bd. of Educ.*, 412 N.E.2d 447 (Ill. 1980)). Under such circumstances, the principal is estopped from denying the agent's authority to act. *Bank of North Carolina, N.A. v. Rock Island Bank*, 630 F.2d 1243, 1251 (7th Cir. 1980).

---

[8]An exception to this rule exists where the lender exercises "dominion and control" over the borrower. *ARH*, No.87 C 511, 1987 WL 17843 at *3. That is, the party attempting to establish the relationship must show "that he placed trust and confidence in another so that the other gained influence and superiority over him." *Santa Claus Indus., Inc. v. First Nat'l Bank of Chicago*, 576 N.E.2d 326, 331 (Ill.App.Ct. 1991). This can be shown by reference factors such as kinship, age disparity, health, mental condition, education, business experience, and extent of reliance. *Id*. The fact that a borrower placed trust and confidence in its lender does not meet this burden. *Bank Computer Network Corp. v. Continental Illinois Bank and Trust*, 442 N.E.2d 586, 594 (Ill.App.Ct. 1982). Here, Willmott has not established facts to imply a fiduciary relationship.

An agent's apparent authority is determined by evaluating the principal's conduct, not the agent's conduct, toward the third party. *Bethany Pharmacal Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 859 (7th Cir. 2001). That is, "the principal must do something to lead the third party to believe that the agent is authorized to act." *Id.* at 860. In addition, apparent authority may arise from the silence of the principal when he or she knowingly allows another to act as an agent. *Id.* (*citing Matyka v. Schroeder*, 504 N.E.2d 1289, 1295 (Ill.App.Ct. 1987). The scope of the apparent agent's authority is the authority that a reasonably prudent person might believe the agent possessed based on the principal's actions. *Id*; *Burgos*, 583 N.E.2d at 551. Notably here, an agent can have apparent authority outside of the authority granted to him by a written document. *Rankow v. First Chicago Corp.*, 870 F.2d 356, 360 (7th Cir. 1989) (express limitation of authority may be overcome by actions inconsistent with that limitation).

Here, the parties dispute whether Willmott properly authorized Erwin to make draws on the loan agreements. The facts are undisputed, however, that Willmott delegated substantial authority over his accounts at BOA to Erwin in writing. He executed an unconditional power of attorney allowing Erwin to write checks on his checking account. BOA 56.1 at 10. He executed two letters to BOA, each stating that Erwin had "Power of Attorney over my accounts to sign checks, do wire transfers, and wire funds," and listing several account numbers. *Id.* at 14, 19. In addition, Willmott signed several separate Durable Power of Attorney bank forms, signature cards, and wire transfer forms which gave Erwin authority over numerous accounts including four private loan accounts. Willmott 2nd 56.1 at 7, 10, 11-12. *See*, *Harnischfeger Corp. v. Hoosier Mortgage Serv., Inc.*, 182 F.2d 188, 120-121 (7th Cir. 1950) (bank manager in charge of mortgage loans had apparent authority to sign letters of credit for prefabricated houses).

More importantly, Willmott admitted that he authorized Erwin to relay his requests for advances on his lines of credit to the bank on a number of occasions. BOA 2nd 56.1 at 20; BOA 3rd 56.1 at 174; *See Burgos*, 583 N.E.2d at 551 (course of dealing relevant to inquiry regarding apparent authority and apparent authority established where agent was ongoing intermediary between plaintiff and defendant). Noble, Willmott's previous assistant, had broad authority over Willmott's finances and also made draws on his lines of credit. BOA 56.1 at 9. Indeed, Willmott managed his accounts day-to-day through Noble and later Erwin. *See* BOA 2nd 56.1 at 10. In the normal course of dealings the administrative assistants at BOA who dealt with account requests regarding any of the accounts rarely, if ever, spoke to Willmott. BOA 2nd 56.1 at 10. Most notably, Willmott specifically indicated to BOA that Erwin was authorized to act on all of his accounts, stating at one point that Erwin was "his person" and that BOA was to act on her authority. BOA 2nd 56.1 at 13. *See*, *Wasleff v. Dever*, 550 N.E.2d 1132, 1134 (Ill.App.Ct. 1990) (daughter who had handled father's financial affairs for years had apparent authority to withdraw money despite the fact that father's signature was the only one on the signature card).

During this five year period, BOA sent Willmott monthly checking account statements indicating each check that was written and the amount, quarterly loan statements reflecting all transfers and credit reports. During that five year period, Willmott never contacted BOA to state that Erwin did not have permission to make the draws that she had made. BOA 56.1 at 26. *Bethany Pharmacal*, 241 F.3d at 859 (*citing Matyka*, 504 N.E.2d at 1295) (apparent authority may arise from the silence of the principal when he or she knowingly allows another to act as an agent). Although the loans were increasing in size, rather than question the amounts, Willmott increased the borrowing limit on the 1997 loan in 1999 and 2000 and the 1999 loan in 2000 and 2002. Even when

his loans fell out of margin following September 11th, Willmott failed to assert that Erwin had exceeded her authority.  BOA 2nd 56.1 at 22; BOA 3rd 56.1 at 171.

Based on this long course of dealing and Willmott's acquiescence, BOA was reasonable in accepting that Erwin was authorized to draw on Willmott's loans.  Although Willmott asserts that BOA should have been on notice that accepting such authority was unreasonable because on one occasion, Erwin made a draw on a loan when Willmott was attempting to pay down the note.  BOA 2nd 56.1 at 18.  BOA contacted Federal Street, and Federal Street offered an explanation for the confusion.  *Id*. at 18-19.  Willmott also notes that, at one point Lauerman wondered why Willmott went through so much money.  Willmott 3rd 56.1 at 76.  However it is not reasonable to expect Lauerman to connect a concern that Willmott overspent to a suspicion that this overspending was a result of embezzlement.  These two "events" over a period of five years are not sufficient to eradicate the numerous years of dealing with BOA that established a pattern of permitting Erwin to make transfers without any input from Willmott.

Third parties have a duty exert reasonable diligence to verify an agent's authority.  *Progress Printing Corp. v. Jane Byrne Political Committee*, 601 N.E.2d 1055, 1067 (Ill.App.Ct. 1992).  However, this duty "does not obviate a principal's own duty to third parties, which is to exercise reasonable diligence in monitoring its agents' activities . . .particularly when the information is readily available."  *Id*.   The two potential indicators in this case - one which by all accounts was adequately explained and one which simply indicates that Willmott was overspending -  over the period of five years are not enough to render BOA's reliance on Erwin's authority unreasonable in light of the evidence of her ongoing authority.

Most importantly, Willmott did little or nothing to monitor his agent. She and her predecessor conducted Willmott's affairs as a matter of course, and Willmott permitted them to do so without even checking his bank statements or inquiring as to their whereabouts. *See*, *Id.* (plaintiff did not communicate lack of authority of certain agents and purchase orders were communicated exclusively by agents throughout course of dealing); *See also*, *Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1211 (7th Cir. 1993) (principal liable for fraud committed by agent with apparent authority). Remarkably, in spite of Willmott's training and experience as a sophisticated businessman serving in positions of financial authority in various entities, Willmott failed to monitor his agent's actions through the most basic checks and balances: reviewing his own bank statements, or at least asking for copies of them to review. All of Willmott's words and conduct left the reasonable impression that Erwin was his agent with authority to act. Even though the parties dispute whether the Ellison letter granted express written authority to Erwin to transfer funds from the loan accounts, there is no disputed fact that the course of dealings, conduct of Willmott and Erwin, and length of dealings gave the reasonable impression that she acted with Willmott's authority.

### *Ratification*

Regardless of whether an agent lacks authority, a principal may ratify an agent's unauthorized actions by failing to repudiate them or by accepting their benefit. *Sphere Drake*, 376 F.3d at 677. Ratification of an unauthorized act confirms the act and is tantamount to original authorization. *Kulchawik v. Durabla Mfg. Co.*, 864 N.E.2d 744, 750 (Ill.App.Ct. 2007). In order to ratify an agent's actions, a principal must have full knowledge of the facts and the choice to either accept or reject the transaction. *Id.*

Here, Willmott ratified Erwin's draws on his loans through his actions and acquiescence. Having been informed that the loans were increasing in size, Willmott increased the borrowing limit on the 1997 loan in 1999 and 2000 and increased the limit on the 1999 loan in 2000 and 2002. BOA 2nd 56.1 at 22. Similarly, he pledged additional collateral to support the outstanding principal when the loans fell out of margin following September 11th. BOA 3rd 56.1 at 171. In addition, the loan agreements occasionally came due and were "rolled over," and Willmott was informed of these rollovers and admits that he was aware of them. *Id.* at 176. Lastly, Willmott made payments on his 1997 and 1999 loans. *See Kaskel v. Northern Trust Co.*, 328 F.3d 358360 (7th Cir. 2003) (plaintiff made payments on a loan after learning that bank violated her contract by accepting a non-endorsed check). All of these actions, particularly increasing the borrowing limit without question, are inconsistent with a repudiation Erwin's transactions.

Most importantly, Willmott received countless financial statements from both BOA and Federal Street including his checking account and loan activity throughout the entire five year period. BOA 56.1 at 13, 26. Ratification may be inferred from a principal's long-term acquiescence to an allegedly unauthorized transaction. *Sphere Drake*, 376 F.3d at 677 (*citing Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 808 (Ill.App.Ct. 1998); *see*, *Phillip v. First Nat'l Bank of Chicago*, 18 N.E.2d 57, 61-62 (Ill.App.Ct. 1938). In such cases, courts should inquire as to whether the principal repudiated within a reasonable time. *Sphere Drake*, 376 F.3d at 677. Here, Willmott was given nearly one hundred notices of what was occuring on his accounts: approximately fifty checking account statements; approximately twenty loan statements; four increases in loan amounts; and rollovers of loans.

To this end, Willmott asserts that he did not review his monthly statements as a regular practice and that Erwin balanced his accounts and destroyed the statements to cover for her embezzlement. BOA 56.1 at 13; BOA 3rd 56.1 at 170; Willmott 56.1 at 19. Although a principal generally is required to have knowledge of the transaction at issue, "one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts." *Progress Printing*, 601 N.E.2d at 1067-68 (principal ratified orders by unauthorized persons despite the fact that he did not review invoices because failure to review the invoices resulted from a breach of his duty to gain knowledge of the transactions). Here, Willmott allowed the transactions to occur without ever seeking verification by reviewing statements, speaking with Erwin about transactions, questioning transactions with BOA, or even seeking to obtain copies of the statements. Also, Willmott acknowledged at his deposition that he had actual knowledge of several of the draws on his lines of credit soon after they took place. BOA 3rd 56.1 at 149-54; 156-57; 159-62; 167. He also identified his signature on two letters giving him notice of draws on his credit. *Id*. at 150, 167. This lack of attentiveness, acquiescence, and negligence does not create a disputed fact as to whether he ratified Erwin's actions. No reasonable person could find that such behavior is anything but "long-term acquiescence" to an unauthorized transaction.

Indeed, Willmott's case seems most similar to *Phillip v. First National Bank of Chicago*. In *Phillip*, the plaintiff opened a bank account requiring that checks have both a signature and countersignature. *Phillip*, 18 N.E.2d at 58. Phillip sued because the bank cashed thirty-three checks that were not properly countersigned. *Id*. at 58-59. Some of the checks were signed solely by Phillip himself. *Id*. at 62-63. During the relevant time period, approximately three years, Phillip

received statements and cancelled checks each month but failed to examine them until May of 1935, having opened the account in 1932. *Id*. at 59.

The court held that a depositor has a duty to examine his statements and report any errors to the bank without unreasonable delay and that Phillip disregarded this duty. *Id*. at 61-62. It further found that Phillip had notice of the improper checks, and by signing some checks himself, actively participated in violating his own instructions. *Id*. at 62. Thus, it held that "this constituted a course of dealing on the part of Phillip, amounting to ratification and consent to the payment of the checks in accordance with his own practices, and placed the responsibility on his shoulders." *Id*. at 63; *See also*, *Harlan E. Moore & Co. v. Champaign Nat'l Bank*, 141 N.E.2d 97 (Ill.App.Ct. 1957) (irregular transactions occurred for one and one-half years and defendant "might reasonably expect" plaintiff to discover them in a month or two); *Kores Carbon Paper & Ribbons Mfg. Co. v. W. Office Supply Co., Inc.*, 110 N.E.2d 461, 462-63 (Ill.App.Ct. 1953) (bank not liable for checks drawn with only one signature when two were required where depositor failed to disaffirm within a reasonable time).

Quite similarly here, Erwin drew from Willmott's lines of credit over a five year period. Willmott received countless statements and disregarded his duty to review them, nor did he balance his own checkbook. Similar to the plaintiff in *Phillip*, Willmott participated in violating his own alleged instructions in that he tasked Erwin with making draws from his 1997 and 1999 loans from BOA. Thus Erwin, like Phillip, ratified and consented to the bank's alleged violation of his contract and cannot now recover.

Willmott asserts that BOA's ratification defense is barred because BOA acted in bad faith. He cites *Tuberculosis Assn. v. Springfield Marine Bank*, Gen. No. 8,905, 1935 WL 3696 (Ill.App.Ct. October, 1935) and *Mattison-Greenlee Serv. Corp. v. Culhane*, 20, F.Supp. 882, 886

(D.C.Ill. 1937) (overturned on other grounds) for the premise that where a bank fails to observe limitations on an agent's drawing power and the bank is negligent in detecting the fraud, the bank remains liable regardless of whether the depositor failed to properly examine banks statements. First, it is worth noting that both of these cases were decided prior to *Phillip*. Regardless, to the extent that they remain good law, these cases stand merely for the premise that a depositor's duty to review bank statements will not be strictly enforced where the bank is negligent in detecting a forgery. In both cases, the wrongful agent had no authority for his actions. Neither case involves a situation like Willmott's, where the plaintiff took actions to create apparent authority for the agent and actually took actions to violate his own instructions in addition to merely failing to review bank statements and report irregularities to the bank. Here, the fact that Willmott failed to review the countless bank statements sent to him is bolstered by various other affirmative actions. In any case, to the extent any of these cases could be construed bar a ratification defense, it does not bar BOA's apparent authority defense, and the ratification evidence asserted still serves to further bolster BOA's apparent authority defense.

For the reasons discussed above, BOA's Motion for Summary Judgment is granted; BOA's Motion to Strike the Affidavit of Shepherd Prior is denied as moot; BOA's Motion to Strike the Report of Dennis E. Czurylo is denied as moot; and BOA's Motion to Reconsider is denied. Willmott's Motion to Strike BOA's Responses to Plaintiff's Additional Undisputed Facts is granted in part and denied in part; Willmott's Motion to Strike the Affidavit of John Brennan is denied; and Willmott's Motion to Strike the Affidavit of James F. Dickerson is denied.

So ordered.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:          June 17, 2008